# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LAURA YASKO, on behalf of
ALAN YASKO, M.D.,

                Plaintiff,

                v.

STANDARD INSURANCE
COMPANY,

                Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

**Case No. 12 C 2661**

**Magistrate Judge Sidney I. Schenkier**

## MEMORANDUM OPINION AND ORDER[1]

This case is before the Court on the cross-motions for summary judgment brought by Laura Yasko, on behalf of Alan Yasko, M.D. (doc. # 27), and defendant Standard Insurance Company ("Standard") (doc. # 30). Ms. Yasko brought this action pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), as the surviving spouse and named beneficiary of Dr. Alan Yasko, challenging the denial of accidental death benefits (doc. # 1: Complaint). Prior to his death, Dr. Yasko was a professor of orthopedic surgery at Northwestern University's Feinberg School of Medicine and served as Chief of Musculoskeletal Oncology at Northwestern's Robert H. Lurie Comprehensive Cancer Center (doc. # 29: Plaintiff's Local Rule 56.1 Statement of Material Facts ("Pl.'s SOMF") at ¶ 11). As part of his compensation, Dr. Yasko participated in an employee welfare benefit plan maintained by Northwestern Medical Faculty Foundation ("Northwestern") for its eligible employees, which included life insurance and accidental death and dismemberment ("AD&D") insurance coverage underwritten and administered by defendant Standard (Pl.'s SOMF at ¶¶ 1, 6; doc. # 32:

---

[1] On February 13, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 12).

Standard Insurance Company's Local Rule 56.1 Statement of Material Facts ("Def.'s SOMF") at ¶ 1). Ms. Yasko challenges the denial of benefits totaling $1,200,000.00[2] under Standard's insurance policy following her husband's death in Mexico, where he had traveled by air to speak at a medical conference (Pl.'s SOMF at ¶¶ 1, 6, 17; doc. # 28: Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem.") at 1-2). Ms. Yasko contends that Dr. Yasko's death was caused by a pulmonary embolism[3] "triggered by extensive air travel," and that consequently, it was accidental (Pl.'s SOMF at ¶ 22). Standard argues, however, that it properly denied coverage because Dr. Yasko's death was not caused by a bodily injury sustained in an accident, as required by the policy's accidental death clause (doc. # 36: Standard Insurance Company's Memorandum in Support of its Motion for Summary Judgment ("Def.'s Mem.") at 11-15).

For the reasons set forth below, the we grant the defendant's motion for summary judgment, and deny the plaintiff's motion for summary judgment.

## I.

The following facts are drawn from the pleadings and the parties' Local Rule 56.1 submissions. The facts are undisputed unless otherwise noted by the Court. As part of its employee benefits plan, Northwestern provided Dr. Yasko with life insurance and AD&D

---

[2] The $1,200,000.00 AD&D coverage included $200,000.00 in basic AD&D benefits and an additional AD&D benefit of $1,000,000.00 (Pl.'s SOMF at ¶ 6; doc. # 11: Standard Insurance Company's Answer to Plaintiff's Complaint ("Answer") at ¶ 8).

[3] "Pulmonary embolism is when one or more pulmonary arteries in [the] lungs become blocked. In most cases, pulmonary embolism is caused by blood clots that travel to the lungs from the legs or rarely other parts of the body (deep vein thrombosis, or DVT). . . . Although anyone can develop deep vein thrombosis and pulmonary embolism, factors such as immobility, cancer and surgery increase [the] risk." *Diseases and Conditions Pulmonary Embolism*, MayoClinic.org, http://www.mayoclinic.org/diseases-conditions/pulmonary-embolism/basics/definition/con-20022849 (last visited May 7, 2014).

insurance coverage under Group Life Insurance Policy, Group Policy No. 136810-A, issued by Standard (Pl.'s SOMF at ¶ 1; Def.'s SOMF at ¶ 1). The policy provides, in relevant part:

### The AD&D Benefit

. . . will be paid by Standard, if you are insured for accidental death & dismemberment insurance under the Group Policy and:

(1) you sustain bodily injuries as a result of an accident; and
(2) as a result, you suffer one of the following losses within 365 days after the date of the accident:
     (a) Loss of life. Standard will pay 100% of the full amount.
Proof of Loss satisfactory to Standard must be received before the accidental death and dismemberment insurance under the Group Policy will be paid.

### No AD&D Benefit Will Be Paid

. . . if your death or other loss is caused by:
(1) a disease or illness of any kind, or medical or surgical treatment of these, except those resulting from purely accidental circumstances.

(Pl.'s SOMF at ¶¶ 9, 10; Def.'s SOMF at ¶ 5). The "Benefits at a Glance" section of the policy states: "No AD&D Will Be Paid . . . if your death or other loss is caused by: (1) A disease or illness of any kind, including heart attack or stroke. . ." (Def.'s SOMF at ¶ 6; doc. # 46: Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts ("Pl.'s Resp.") at ¶ 6). Finally, the policy specifies that Standard has "Discretionary Authority For Claims," and states: "Benefits will be provided only if Standard decides in its discretion that you are entitled to them. This discretionary authority includes determining eligibility for benefits and interpreting the terms of the Group Policy" (Pl.'s SOMF at ¶ 11; Def.'s SOMF at ¶ 9).

In March 2010, Dr. Yasko was diagnosed with a carcinoid tumor[4] in the left lower lobe of his lung (Pl.'s SOMF at ¶ 12; Def.'s SOMF at ¶ 11). On March 23, 2010, Dr. Yasko was

---

[4] "Carcinoid tumors are a type of slow-growing cancer that can arise in several places throughout [the] body. Carcinoid tumors, which are one subset of tumors called neuroendocrine tumors, usually begin in the digestive

3

admitted to MD Anderson Cancer Center at the University of Texas in Houston, and underwent surgery, performed by Dr. Ara Vaporciyan, to remove the carcinoid tumor, a portion of the lower lobe of his left lung, and thirteen lymph nodes, as well as to repair a damaged section of the pulmonary artery (Pl.'s SOMF at ¶¶ 13, 14; Def.'s SOMF at ¶¶ 12-13).[5] One of the thirteen lymph nodes tested positive for metastasis (Pl.'s SOMF at ¶ 14 n.3; Def.'s SOMF at ¶ 13).[6] At a follow-up visit on April 23, 2010, Dr. Yasko stated that he had experienced occasional chest tightness, intermittent gurgling while reclining, numbness in the left anterior chest, and mild fatigue (Def.'s SOMF ¶ 16; Pl.'s Resp. at ¶ 16). Dr. Yasko reported that he had returned to work, "has had 2 clinics and assisted in an 8-hour surgery," and had "no difficulty other than mild fatigue" (Def.'s SOMF ¶ 16; Pl.'s Resp. at ¶ 16). He was instructed to return in six months for a CT scan of his chest and again at the one-year anniversary of his surgery to undergo a fiberoptic bronchoscopy (Def.'s SOMF ¶ 16; Pl.'s Resp. at ¶ 16).

On August 16, 2010, Dr. Yasko traveled by air from Chicago to Houston, and on August 18, 2010, Dr. Yasko flew from Houston to Mexico to speak at a medical conference (Pl.'s SOMF at ¶ 17; Def.'s SOMF at ¶ 40). He arrived in Quintana Roo, Mexico around 4:00 pm and was greeted by a colleague, Dr. Carlos Cuervo Lozano,[7] who noted that Dr. Yasko appeared to be

---

tract (stomach, appendix, small intestine, colon, rectum) or in the lungs." *Carcinoid Tumors*, MayoClinic.org, http://www.mayoclinic.org/diseases-conditions/carcinoid -tumors/basics/definition/con-20030114 (last visited May 7, 2014).

[5] Dr. Yasko was treated at MD Anderson Cancer Center under the alias "Don James" (Def.'s SOMF ¶ 11; Pl.'s Resp. at ¶ 11). We note this otherwise irrelevant detail only to avoid confusion because the MD Anderson treatment notes in the record refer to the patient as Don James, rather than as Dr. Yasko (*see, e.g.*, STND 12-01160-00314).

[6] "Almost without exception, what kills cancer patients is metastasis, or cancer spread, not the primary tumor." *Laboratories: Cell Adhesion and Metastasis*, MayoClinic.edu, http://www.mayoclinic.edu/research/labs/cell-adhesion-metastasis/overview (last visited May 7, 2014).

[7] Dr. Lozano is referred to as Dr. Cuervo in the investigators' notes in the record (*see, e.g.*, doc. # 31: Appendix to Standard Insurance Company's Motion for Summary Judgment Administrative Record, Volumes I - IX

tired and perspiring (Pl.'s SOMF at ¶ 17; Def.'s SOMF at ¶ 29). Dr. Lozano asked Dr. Yasko if

he felt well, and Dr. Yasko replied affirmatively (Def.'s SOMF at ¶ 29; Pl.'s Resp. at ¶ 29 ).

Although there was a reception for conference attendees that night, Dr. Yasko did not attend, and

at 5:00 a.m. the next morning, Dr. Lozano was summoned to Dr. Yasko's hotel room, where Dr.

Lozano found him in respiratory failure (Pl.'s SOMF at ¶ 18; Def.'s SOMF at ¶¶ 29-30; Pl.'s

Resp. at ¶¶ 29-30). Dr. Yasko was given artificial respiration until the ambulance arrived, but

slipped into unconsciousness before he could be transported to a local hospital (Pl.'s SOMF at ¶

18; Def.'s SOMF at ¶ 30; Pl's Resp. at ¶ 30). Dr. Lozano did not accompany Dr. Yasko to the

hospital because he had to attend to conference activities (Def.'s SOMF at ¶ 30; Pl's Resp. at ¶

30).

An ambulance took Dr. Yasko to Hospiten Hospital[8] in Playa Del Carmen, Quintana Roo,

where he died around 7:00 a.m. that morning (Pl.'s SOMF at ¶ 19; Def.'s SOMF at ¶¶ 19, 31, 32;

doc. # 47: Standard Insurance Company's Response to Plaintiff's Local Rule 56.1 Statement of

Material Facts ("Def.'s 56.1 Resp.") at ¶ 19). At the hospital, Dr. Oscar Hernandez Gea, the

doctor who had attempted to save Dr. Yasko's life, certified the causes of death as massive

pulmonary thromboembolism and lung cancer (Pl.'s SOMF at ¶ 19; Def.'s SOMF at ¶ 20; Def.'s

56.1 Resp. at ¶ 19; Pl.'s Resp. at ¶ 20). In addition, Dr. Yasko's death certificate states that his

death was due to natural causes (Def.'s SOMF at ¶ 20; Pl.'s Resp. at ¶ 20). Dr. Lozano reported

that he had not known that Dr. Yasko suffered from lung cancer and had undergone surgery, but

only found this out when the doctors who attended to Dr. Yasko at the hospital so informed him,

and because he saw an x-ray, which he said "showed [that] a pulmonary embolism was

---

at STND 12-01160-00100). Documents in the appendix are identified using the Bates-numbers in the lower right corner.

[8] This hospital is also referred to as Hospital Riviera Maya (Def.'s 56.1 Resp. at ¶ 19).

apparently the cause of [Dr. Yasko's] death" (Def.'s SOMF at ¶ 30; Pl.'s Resp. at ¶ 30). No x-rays were submitted to Standard, and no charges for x-rays appear on the hospital services invoice (Def.'s SOMF at ¶ 33; Pl.'s Resp. at ¶ 33). No autopsy was performed, and Dr. Yasko's body was cremated (Def.'s SOMF at ¶ 23; Pl.'s Resp. at ¶ 23).

## II.

On November 9, 2010, Plaintiff submitted a claim to Standard for basic and additional life insurance benefits, and basic and additional AD&D benefits (Pl.'s SOMF at ¶ 20; Def.'s SOMF at ¶ 25; Pl.'s Resp. at ¶ 25). Standard obtained Dr. Yasko's medical records from Northwestern University Hospital, MD Anderson Cancer Center, and the Hospital Riviera Maya and retained Diligence International Group to travel to Mexico to investigate his death (Def.'s SOMF at ¶¶ 26-27; Pl.'s Resp. at ¶¶ 26-27). The investigators obtained official death certificates, reviewed medical records, and interviewed hotel and hospital personnel, a United States Consulate official, and the owner of the funeral home that performed the embalming (Def.'s SOMF at ¶ 27; Pl.'s Resp. at ¶ 27).

On February 14, 2011, Standard wrote Ms. Yasko a letter approving her claim for basic and additional life insurance benefits in the total amount of $1,200,000.00, plus interest (Def.'s SOMF at ¶ 34; Pl.'s Resp. at ¶ 34). In that same letter, Standard notified Ms. Yasko that it was declining her claim for basic and additional AD&D benefits because it concluded that Dr. Yasko's death was not the result of bodily injuries sustained as a result of an accident (Pl.'s SOMF at ¶ 21; Def.'s SOMF at ¶ 35). On October 24, 2011, Ms. Yasko, through her attorney, appealed Standard's decision declining AD&D benefits, asserting that Dr. Yasko's "extended demobilization" during air travel "caused a blood clot in his leg to be released and cause a pulmonary embolism" (Pl.'s SOMF at ¶ 22; Def.'s SOMF at ¶¶ 36-37; Pl.'s Resp. at ¶¶ 36-37;

6

doc. # 31: Appendix to Standard Insurance Company's Motion for Summary Judgment Administrative Record, Volumes I - IX at STND 12-0116-00298). Her attorney also contended that prolonged sitting in an airplane was "analogous" to being in a "car accident, which then caused a blood clot to dislodge and cause a heart attack" (Def.'s SOMF at ¶ 37; Pl.'s Resp. at ¶ 37; STND 12-0116-00298). Ms. Yasko's attorney further stated, "There are many ways to be exposed to accidental circumstances which could cause a heart attack, including car accidents, electrocution, being exposed to drugs, etc. These plane trips are just another one" (Def.'s SOMF at ¶ 37; Pl.'s Resp. at ¶ 37; STND 12-0116-00298).

With Ms. Yasko's appeal, she supplied Dr. Yasko's medical records for lung cancer treatment at MD Anderson Cancer Center, as well as a letter addressed "To whom it may concern," signed by Dr. Yasko's colleague, Dr. Lozano, and a report prepared, at the request of her counsel, by Dr. Jesse Hall, Section Chief of Pulmonary and Critical Care Medicine at the University of Chicago (Pl.'s SOMF at ¶ 22; Def.'s SOMF at ¶ 38). In his letter, Dr. Lozano, stated that "[i]n my professional opinion, Dr. Yasko died of a massive pulmonary embolism due to the extensive air travel he experienced the week before his death," and that "[h]is death was an unexpected sudden death which Alan Yasko did not foresee" (Def.'s SOMF at ¶ 42; Pl.'s Resp. at ¶ 42).

In Dr. Hall's report, he listed his qualifications as a "board certified internal medicine physician with a certification in critical care medicine" and opined that Dr. Yasko's death was caused by a massive pulmonary embolus unrelated to underlying lung cancer, because that had been "cured" by the surgical removal of the tumor in March 2010 (STND 12-01160-00583 to 584; Pl.'s SOMF at ¶ 22). Dr. Hall asserted that the surgery had been distant enough in time to have had "no effect on Dr. Yasko's predisposition to develop pulmonary embolism" (STND 12-

01160-00583 to 584; Pl.'s SOMF at ¶ 22). Dr. Hall stated that the tumor had been "a benign carcinoid with no evidence of spread to lymph nodes and no residual tissue remaining after lobectomy" (STND 12-01160-583 to 584). Instead, Dr. Hall asserted that the risk factors for Dr. Yasko's "event was his prolonged airline travel, coupled to his age and body weight (his body mass index at the time of his admission to MD Anderson had been approximately 31, signaling very modest obesity)" (*Id.* at 584). Finally, Dr. Hall concluded that Dr. Yasko's death "was not the result of the progression of an identifiable disease, but rather should be considered to be accidental in the sense that it resulted from the events of daily life coupled to misfortune" (*Id.*).

Standard consulted Dr. Bradley Fancher, a physician who is board-certified in internal medicine, who evaluated the information in the administrative record (Def.'s SOMF at ¶ 43; Pl.'s Resp. at ¶ 43). In his December 6, 2011 Physician Consultant Memo, Dr. Fancher opined that "with no diagnostic tests done at the time of his death and with no autopsy being performed[,] it is impossible to arrive at any conclusion with regard to the cause of [Dr. Yasko's] demise" (Def.'s SOMF at ¶ 44; Pl.'s Resp. at ¶ 44). Dr. Fancher stated that "multiple potential medical explanations" exist, including "myocardial infarction, cardiac arrhythmia, dissecting aneurysm, a ruptured aneurysm, a GI bleed," as well as that Dr. Yasko might have had a "metastatic carcinoid and . . . a hypercoagulable state" (Def.'s SOMF at ¶ 44; Pl.'s Resp. at ¶ 44). Dr. Fancher explicitly mentioned Dr. Lozano's opinion and accepted "Dr. Lozano's postulate that [Dr. Yasko] died from a deep venous thrombosis and subsequent pulmonary embolism as one of the many possibilities that might have caused the claimant's death" (Def.'s SOMF at ¶ 44; Pl.'s Resp. at ¶ 44).

Dr. Fancher further opined that Dr. Yasko had not been subjected to any trauma because taking a routine airplane flight does not constitute an accident:

The claimant was not exposed to any undue trauma or unusual trauma. Flying on an airplane, of course, is a common everyday event and is neither accidental nor does it involve any trauma. While sitting for prolonged periods of time does reduce venous return in the lower extremities and predisposes individuals to thromboembolism, the same situation happens if individuals sit for long periods of time at home, as opposed to being on an airplane. While venous stasis and reduction of venous return are predisposing factors for venous thrombosis, this circumstance does not constitute an accident. I would not consider known risk factors for venous thromboembolism to be considered "accidental" events, they are simply risk factors.

(Def.'s SOMF at ¶ 45; Pl.'s Resp. at ¶ 45). Dr. Fancher's memorandum makes no reference to the letter that Ms. Yasko had submitted from Dr. Hall.

On December 13, 2011, Standard informed Ms. Yasko of its final determination upholding the decision to decline her claim for AD&D benefits, stating: "We have not been provided with satisfactory Proof of Loss as required under the terms of the policy to pay the accidental death benefit" (Def.'s SOMF at ¶ 46; Pl.'s Resp. at ¶ 46). Standard justified its conclusion, explaining that the AD&D insurance has an exclusion for deaths caused by disease or illness: "No AD&D benefits are payable for a death caused from disease or illness, which include medical conditions such as heart attack and stroke . . . and would also include pulmonary embolism" (Def.'s SOMF at ¶ 47; Pl.'s Resp. at ¶ 47). Standard also concluded that the circumstances of Dr. Yasko's death did not constitute sustaining "bodily injuries as a result of an accident" as required by the AD&D policy provisions:

Although Dr. Yasko travelled by air on the day prior to his death, he did not suffer a bodily injury from an accident. Air travel is considered normal activity; whereas, an accident is an unexpected or unplanned event such as motor vehicle accident causing bodily injury or death by an unavoidable circumstance.

(Def.'s SOMF at ¶ 48; Pl.'s Resp. at ¶ 48).

## III.

The Court finds that there are no disputed issues of material fact,[9] and that judgment can be entered as a matter of law. "'Judicial review of an ERISA administrator's benefits determination is de novo unless the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Cerentano v. UMWA Health and Retirement Funds*, 735 F.3d 976, 981 (7th Cir. 2013) (quoting *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Here, the parties agree that Standard's policy grants such discretionary authority to the plan administrator (Pl.'s SOMF at ¶ 11; Def.'s SOMF at ¶ 9; Pl.'s Resp. at ¶ 9). Consequently, we ask only whether the plan administrator's decision was arbitrary and capricious. *Cerentano*, 735 F.3d at 981; *Tompkins v. Cent. Laborers' Pension Fund*, 712 F.3d 995, 999 (7th Cir. 2013).

Under the arbitrary and capricious standard, the Court will uphold a plan administrator's denial of benefits as long as there is "rational support in the record" for the decision. *Becker v. Chrysler LLC Health Care Benefits Plan*, 691 F.3d 879, 885 (7th Cir. 2012). The Court must give deference to the plan administrator's interpretation of ambiguous plan language. *See id.* at 890; *see also Weitzenkamp v. Unum Life Ins. Co. of America*, 661 F.3d 323, 329 (7th Cir. 2011) ("'an administrator's interpretation is given great deference and will not be disturbed if it is based on a reasonable interpretation of the plan's language'") (quoting *Wetzler v. Ill. CPA Soc'y & Found. Ret. Income Plan*, 586 F.3d 1053, 1057 (7th Cir. 2009)); *Hess v. Reg-Ellen Mach. Tool*

---

[9] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements. When we cite as undisputed a statement of fact that a party has attempted to dispute, that reflects our determination that the evidence does not show that the fact is in genuine dispute." *Barkl v. Kaysun Corp.*, No. 10 C 2469, 2011 WL 4928996, at *1 n.2 (N.D. Ill. Oct. 13, 2011) (citing *Zitzka v. Vill . of Westmont*, 743 F. Supp. 2d 887, 899 n.2 (N.D. Ill. 2010)).

*Corp.*, 423 F.3d 653, 662 (7th Cir. 2005) (courts "must view the contractual ambiguity through a lens that gives broad discretion to the plan administrator to interpret the plan") (citation omitted). It is not the Court's role to make judgment calls; rather, the plan "administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (quoting *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 576 (7th Cir. 2006)); *see also Green v. UPS Health & Welfare Package for Retired Employees*, 595 F.3d 734, 738 (7th Cir. 2010) (the plan administrator's decision "is not arbitrary and capricious if it falls within the range of reasonable interpretations").

Although our review is highly deferential, it "is not a rubber stamp." *Holmstrom*, 615 F.3d at 766. The plan administrator must give specific reasons for a denial, communicate those reasons to the claimant, and afford the claimant a "full and fair review." *Id.* (quoting *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. No. 506*, 545 F.3d 555, 559 (7th Cir. 2008)). Among other considerations, the Court must weigh an administrator's conflict of interest as "a key consideration." *Holmstrom*, 615 F.3d at 766-67. A conflict of interest arises "when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860-61 (7th Cir. 2009). Here, Standard has both the discretionary authority to determine benefits and the obligation to pay. The presence of such a conflict, which exists in this case, will "act as a tiebreaker when the other factors are closely balanced." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

Ms. Yasko makes two primary arguments in support of her motion for summary judgment. *First*, she contends that Standard failed to provide a full and fair review in denying her claim because it failed to send Dr. Hall's report to its consultant Dr. Fancher and failed to

11

articulate grounds for not accepting Dr. Hall's findings. *Second*, she asserts Standard's denial of her claim was arbitrary and capricious because Dr. Yasko's death, as a result of a pulmonary embolism caused by his air travel, was sudden and unexpected and therefore "accidental." We address each of these arguments in turn.

## A.

Ms. Yasko contends that in order for Standard to have afforded a full and fair review of the denial of her claim, it was required to have considered all of the evidence she supplied (Pl.'s Mem. at 4-5). The Supreme Court has observed that "ERISA imposes higher-than-marketplace quality standards on insurers" and requires that plan administrators "provide a 'full and fair review' of claim denials." *Glenn*, 554 U.S. at 115. Ms. Yasko argues that Standard violated that obligation by failing to send Dr. Hall's report to its consultant, Dr. Fancher, and by failing to articulate grounds for not accepting Dr. Hall's findings (Pl.'s Mem. at 4-7). In essence, she contends that because Standard had a structural conflict of interest here (both the discretionary authority to determine benefits and the obligation to pay), its failure to forward the Hall report to Dr. Fancher tips the balance in favor of finding that its denial of her claim was arbitrary and capricious.

Though Ms. Yasko asserts that Standard's expert, Dr. Fancher, "apparently" did not review the report of her expert, Dr. Hall (Pl.'s SOMF at ¶ 24), we find that the record is ambiguous on this point. Standard's December 13, 2011 letter denying the claim for AD&D benefits acknowledges that Ms. Yasko submitted "a copy of Dr. Yasko's medical records and letters containing medical opinions from Jesse Hall, M.D. and Carlos E. Cuervo Lozano, M.D., citing 'Dr. Yasko died of a pulmonary embolism caused by extensive air travel the week preceding his death'" (STND 12-01160-00054). The letter goes on to state: "As part of the

administrative review process, we had a physician consultant, Bradley Fancher, M.D., board certified in internal medicine, comment on the information received" (*Id.*). The letter implies that Standard forwarded the material it had received from Ms. Yasko to Dr. Fancher. At the beginning of Dr. Fancher's memorandum, he states: "I reviewed pertinent medical records" (STND 12-01160-00058). But, the remainder of his memorandum contains no mention of Dr. Hall's report, focusing solely on Dr. Lozano's opinion instead (*Id.* at 58-59). Standard offers no illumination on this fact, providing only the opaque statement that Dr. Fancher "evaluated the information in the Administrative Record" (Def.'s SOMF at ¶ 43), which Ms. Yasko admitted (Pl.'s Resp. at ¶ 43).

It would have been prudent for Standard to have forwarded all of Ms. Yasko's submissions to its expert for his consideration. Perhaps it did so, and Dr. Fancher reviewed both Dr. Hall's report and Dr. Lozano's letter, but opted to comment on only one of two somewhat duplicative submissions. If so, his failure to explicitly address a piece of the record does not require us to reject his opinion or to overturn Standard's denial of the claim. *See Davis*, 444 F.3d at 578 ("there is nothing in ERISA or our precedent requiring doctors to write like lawyers or plan administrators").

But even assuming that Standard neglected to forward the Hall report to Dr. Fancher (or that it did send the report but Dr. Fancher overlooked it), we nevertheless do not deem this omission a sufficient basis for overturning Standard's denial of her claim. *First*, the conclusions in Dr. Hall's report – that Dr. Yasko died of a pulmonary embolism and that it was an accident caused by his air travel – are substantially the same as Dr. Lozano's opinion, which Dr. Fancher clearly considered (doc. # 48: Standard Insurance Company's Response to Plaintiff's Motion for Summary Judgment ("Def.'s Resp. Mem.") at 8). We find that Dr. Fancher's explicit

consideration of Dr. Lozano's opinion satisfies us that Standard provided full and fair review of the theory also raised in the Hall report. *See Marantz v. Permanente Medical Group, Inc. v. Long Term Disability Plan*, 687 F.3d 320, 328 (7th Cir. 2012) (ERISA "does not appear to require the plan to identify each and every piece of evidence that it relied upon in its decision to deny benefits"); *Meade v. Nat'l City Corp. Welfare Plan*, 394 Fed. App'x 308, 314 (7th Cir. 2010) ("nothing in this report was so compelling or different from that in other referenced documentation that the failure to mention the report means we would set aside the decision").

*Second*, although Ms. Yasko also argues that the plan administrator did not discuss Dr. Hall's report, she does not contend that the plan administrator failed to consider Dr. Hall's report (Pl.'s Mem. at 6-7). In fact, the plan administrator specifically acknowledged having received that report (*Id.* at 6; STND 12-01160-00054), but Ms. Yasko complains that Standard "merely brushed aside" Dr. Hall's conclusions in favor of Dr. Fancher's conclusions without explicitly addressing Dr. Hall's report (Pl.'s Mem. at 6-7). Again, we do not find this sufficient basis to conclude that Standard did not afford a full and fair review.

*Third*, and most importantly, Standard explained that its policy language excluded deaths resulting from a disease or illness, such as pulmonary embolism, and that even though the air travel may have triggered the pulmonary embolism, uneventful air travel does not qualify as an "unexpected or unplanned event such as motor vehicle accident causing bodily injury or death by an unavoidable circumstance" (Def.'s SOMF at ¶¶ 47-48; *see* Def.'s Resp. at 2-7). In other words, Standard did not need to discuss Dr. Hall's conclusion that Dr. Yasko's cancer had been cured and that his air travel triggered the pulmonary embolism, because *even assuming that Dr. Hall was correct*, his opinion did not affect Standard's interpretation of its policy language to exclude death caused by an embolism triggered by air travel. And, to the extent Dr. Hall

ventured farther by drawing the conclusion that Dr. Yasko's death qualified as "accidental," Standard was not compelled to accept a medical professional's interpretation of its policy language. *See Sellers v. Zurich American Insurance Co.*, 627 F.3d 627, 632 (7th Cir. 2010) ("construction of the term 'accident' should be left to 'common understanding as revealed in common speech'").

We do not find this to be a borderline case in which evidence of the structural conflict tips the balance in Ms. Yasko's favor. *See Glenn*, 554 U.S. at 117 ("will act as a tiebreaker when the other factors are closely balanced"). Consequently, the failure of Standard's expert, Dr. Fancher, to mention Dr. Hall's report is insufficient to render Standard's determination arbitrary and capricious.

### B.

Standard's position is that, even when accepting as true that Dr. Yasko died of a pulmonary embolism caused by his air travel,[10] those circumstances do not qualify as a death that resulted from an "accident" under the terms of the Standard's policy (Def.'s Mem. at 11-16; Def.'s Resp. at 3-70. For the reasons that follow, we cannot conclude that Standard's position is "downright unreasonable."

### 1.

Because the Plan is governed by ERISA, federal common law principles of contract interpretation apply. *Sellers*, 627 F.3d at 632; *Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050, 1051 (7th Cir. 1991). Those principles require that Plan terms be interpreted in "'an

---

[10] Even though it does not affect the outcome here, we note that the exact cause of Dr. Yasko's death does not appear to be definitively established on this record. His death certificate lists both "massive pulmonary thromboembolism and lung cancer" (Def.'s SOMF at ¶¶ 20, 21; Pl.'s Resp. at ¶¶ 20, 21). No autopsy or clinical tests were performed (Def.'s SOMF at ¶¶ 23, 44; Pl.'s Resp. at ¶¶ 23, 44; Pl.'s SOMF at ¶ 22; Def.'s 56.1 Resp. at ¶ 22). And even Dr. Hall listed Dr. Yasko's air travel as just one of the risk factors, along with his age and weight that may have triggered the embolism (Def.'s SOMF at ¶ 41; Pl.'s Resp. at ¶ 41; STND 12-01160-00584). We find it unnecessary to pursue this issue, however, because we need only decide whether Standard's definition of "accident," which excluded pulmonary embolism caused by air travel, was arbitrary and capricious.

ordinary and popular sense, as [they] would [be understood by] a person of average intelligence and experience.'" *Sellers*, 627 F.3d at 632 (quoting *Cannon v. Wittek Cos. Intern.*, 60 F.3d 1282, 1284 (7th Cir. 1995)). Consistent with that rule, the Seventh Circuit has stated that "the construction of the term 'accident' should be left to 'common understanding as revealed in common speech.'" *Id.* (quoting *Senkier*, 948 F.2d at 1052).

The Seventh Circuit grappled with defining "accident" in *Senkier v. Hartford Life & Accident Insurance Co.*, 948 F.2d 1050 (7th Cir. 1991), an ERISA case in which the insurance policy provided benefits for accidental injuries that cause the death of the insured. There, the appeals court categorized a "medical mishap" during treatment of a disease (a broken IV catheter that pierced the insured's heart) as an illness, rather than an accident. *Id.* at 1054. In reaching this conclusion, the Seventh Circuit surveyed prior case law that distinguished between accidental means and accidental results, but ultimately elected to eschew this kind of line-drawing in favor of leaving "the question to 'the common understanding as revealed in common speech'":

> A lay person has a clear if inarticulate understanding of the difference between an accidental death and a death from an illness, and that understanding will not be altered or improved by head-spinning judicial efforts at definition,

*Id.* at 1052-53. In addition, the appeals court observed that simply because the death was "sudden and unexpected" would not resolve the question of whether it resulted from an accident, because "many illnesses kill swiftly and without warning." *Id.* at 1053 (citation omitted).

More recently, in *Sellers v. Zurich American Insurance Co.*, the Seventh Circuit reaffirmed the *Senkier* rule that the construction of the term "accident' should be left to "'common understanding.'" 627 F.3d at 633 (quoting *Senkier*).[11] In *Sellers*, the Seventh Circuit

---

[11] Although Dr. Hall, Dr. Lozano, and Dr. Fancher all opined on whether or not the pulmonary embolism was the result of an accident, *Sellers* and *Senkier* hold that we are to be guided by the common understanding of the

considered an ERISA case in which the insured had undergone surgery in November 2006 to remove a wire that had been inserted during a prior surgery to repair a work-related knee injury. 627 F.3d at 629-30. Nine days after the surgery to remove the wire, the insured died from an "acute pulmonary embolism with infarct, caused by his immobilization following the operation." *Id.* at 629. The accidental death and dismemberment policy at issue covered accidental deaths occurring within 365 days of the accident. *Id.* The insurance company denied coverage because the surgeon had noted that the wire break was expected, and therefore it had concluded that the breakage could not be considered an accident. *Id.* at 631. The district court found that determination reasonable. *Id.*

Although the *Sellers* court held that the plan gave the administrator discretion to construe its policy terms and applied an "arbitrary and capricious" standard to the review of the company's construction of the Plan term "accident," it applied a *de novo* standard of review to the insurance company's interpretation of *Senkier*. *Id.* at 631-32. The *Sellers* court found that the insurance company's reliance on what a medical professional would consider unexpected or fortuitous for its construction of "accident" was arbitrary, because *Senkier* dictates that the proper focus is whether "'the average person would say that the decedent had died in an accident' or not." *Id.* at 632 (quoting *Senkier*, 948 F.2d at 1054). Despite the insurance company's error in relying on an expert to interpret the plan language, the Seventh Circuit affirmed the insurance company's denial of coverage because under *Senkier*, "'injuries resulting from medical treatment' are not accidents as that term is used in AD&D policies." *Id.* at 634 (quoting *Senkier*, 948 F.2d at 1051-52).

---

term. Consequently, their opinions as medical professionals do not control the resolution of the question of whether Dr. Yasko's death was an "accident" within the meaning of the policy.

Against the backdrop of these Seventh Circuit's precedents, we consider Standard's December 13, 2011 letter rejecting Ms. Yasko's appeal. In that letter, Standard explained that its AD&D coverage differs from regular life insurance because coverage under the terms of the AD&D policy requires:

> sustaining bodily injuries as a result of an accident. No AD&D benefits are payable for a death caused from disease or illness, which include medical conditions such as heart attack and stroke. . . and would also include pulmonary embolism. Although Dr. Yasko travelled by air on the day prior to his death, he did not suffer a bodily injury from an accident. Air travel is considered a normal activity; whereas an accident is an unexpected or unplanned event such as motor vehicle accident causing bodily injury or death by an unavoidable circumstance. We do not agree with your statement that a car accident, which may cause a blood clot to dislodge and cause a heart attack, is analogous to flying in an airplane.

(STND 12-01160-00053; Def.'s SOMF at ¶¶ 47, 48).

Standard concedes that Dr. Hall's theory that Dr. Yasko died as a result of a blood clot that developed in his leg from sitting during air travel and subsequently migrated to his pulmonary artery "is viable conjecture about the biological sequence that led to [Dr.] Yasko's pulmonary embolism and death" (Def.'s Mem. at 12; *see also* Def.'s Resp. Mem.at 1, 3, 8-9 (theory was "medically plausible" and "medically viable")). But Standard points out that its policy only covers an insured who "sustain[s] bodily injuries as a result of an accident," and does not cover injury or death caused by disease or illness (Def.'s SOMF at ¶¶ 5, 6; Pl.'s SOMF at ¶¶ 9, 10; Def.'s Resp. Mem.at 1-2, 4-5, 7-8). Standard asserts that an uneventful airplane trip does not qualify as an "accident" (Def.'s Mem. at 12-13; Def.'s Resp. Mem.at 4). Standard reasons that any prolonged inactivity, such as sitting in a chair, lying in a bed, or riding in a car for a long time, could potentially trigger a fatal pulmonary embolism, and that in such a circumstance, one would not characterize the death as the result of bodily injuries sustained in an accident (Def.'s Mem. at 12-13). Because "applying a common understanding of language used in everyday

speech," one would not say that an embolism caused by air travel constitutes "a bodily injury sustained as a result of an accident, as required by the Plan's AD&D coverage," Standard argues that it reasonably concluded "that [Dr.] Yasko died of natural causes, or an illness, and not as a result of bodily injuries sustained as a result of an accident" (*Id.*).

In contrast, Ms. Yasko contends that, absent an explicit policy definition, a death should be deemed "accidental" when it is sudden and unexpected (Pl.'s Mem. at 8-9; Pl.'s Reply at 3) (citing *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077 (1st Cir. 1990) and *Sellers*, 627 F.3d at 632). She asserts that *Santaella v. Met. Life Ins. Co.*, 123 F.3d 456 (7th Cir. 1997) "directs that a death is 'accidental' when the decedent subjectively held an objective expectation of survival" (Pl.'s Reply at 3; Pl.'s Mem. at 9-10).

We agree with Standard that although Dr. Yasko's death was sudden and unexpected, it was reasonable for Standard to conclude that his death was not the consequence of an accident, as required by the language of its coverage clause. We need not pass on whether Ms. Yasko's preferred definition of accident also might be a reasonable one. Even were that the case, the possibility of multiple reasonable interpretations of that word in the policy does not make it unreasonable for Standard to select one over the other. Indeed, when confronted with competing interpretations that both may be reasonable, it is the responsibility of the plan administrator to make a choice between them. *See Becker*, 691 F.3d at 893 ("Although [the claimant's] interpretation may be reasonable insofar as it has some support in the record, we cannot say that the Plan's interpretation, which has at least as much support, is unreasonable given our deferential standard of review"); *Frye v. Thompson Steel Co., Inc.*, 657 F.3d 488, 493 (7th Cir. 2011) ("it is not our function to decide whether we would reach the same conclusion as the

administrator") (internal quotation marks and citation omitted). The arbitrary and capricious standard of review gives the plan administrator room to make that choice.

Here, even assuming that Ms. Yasko's proposed interpretation is reasonable, we cannot say that the plan administrator was "downright unreasonable" in choosing the interpretation it did. As Standard points out, Ms. Yasko's proposal to apply an "expectation test" could include within the definition of "accident" deaths caused by heart attacks, strokes, aneurysms and the like, which might similarly be triggered by uneventful air travel. These examples seem to us as occurring beyond the common understanding of "accident." And as the Seventh Circuit has observed, "[d]eath is almost always accidental in the sense of unintended by the deceased, so if an accidental result sufficed, coverage would be assured regardless of the cause of death." *Senkier*, 948 F.3d at 1052.

## 2.

The parties have not cited and we have not found any Seventh Circuit case law that directly addresses whether coverage clauses in accidental death insurance policies cover embolisms triggered by air travel. Consequently, to support the reasonableness of its interpretation of the term "accident," Standard offered several out-of-circuit ERISA cases that draw upon how courts have construed "accident" in claims for compensation for death caused by deep vein thrombosis or other illness triggered by air travel (Def.'s Mem. at 13-15, citing *McAuley v. Federal Ins. Co.*, No. 4:05CV1826 AGF, 2009 WL 913510 (E.D. Mo. Mar. 31, 2009); *Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 12cv01590 AJB (MDD), 2013 WL 1431822 (S.D. Cal. Apr. 9, 2013); and *Appeldorn v. Hartford Life and Accident Ins. Co.*, No. 1:09-cv-069, 2010 WL 3475915 (D. N.D. Sept. 2, 2010)).

These cases look to the Warsaw Convention for guidance on the meaning of the word "accident" in situations involving air travel. Article 17 of the Convention makes air carriers liable for death or bodily injury suffered by a passenger "if the accident which caused the damage so sustained took place on board the aircraft." *Air France v. Saks*, 470 U.S. 392, 397 (1985) (English translation of Article 17 of the Warsaw Convention; the original is in French). The Supreme Court has held that under Article 17 an "accident" is "an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405; *see also Olympic Airways v. Husain*, 540 U.S. 644, 651 n.8, 652 (2004).

We, too, find the Warsaw Convention analysis helpful in assessing the reasonableness of Standard's interpretation of the term "accident." "The fact that this reasoning was presented in a Warsaw Convention case does not make it any less cogent when applied to the present case to determine whether [the insurance company's] denial of benefits was reasonable. If there were a contrary body of ERISA law dealing with deaths from DVT following long flights, such authority would govern here, but Plaintiffs have not cited, nor has the Court found such a body of ERISA case law." *McAuley*, 2009 WL 913510, at *18.

In particular, we find especially instructive the court's reasoning in *McAuley*, an ERISA case involving facts and arguments similar to those in the present case. 2009 WL 913510. In *McAuley*, the plan administrator had denied accidental death benefits for an insured whose death resulted from "pulmonary thromboembuli, caused by deep vein thrombosis" several hours after an airplane trip from Ireland to St. Louis, Missouri. *Id.* at *1. The insurance company argued that the death was not caused by an accident and that, in the alternative, the death resulted from illness, disease, or bodily malfunction. *Id.* The accident insurance policies at issue provided compensation for accidents resulting from a covered "Hazard," which included a "Business

Travel Hazard" provision, and stated that "Accident includes unavoidable exposure to elements arising from a covered Hazard," and listed an array of exclusions, such as "sickness, diseases, or infections of any kind. . .." *Id*. at *3. The insured's death certificate listed arteriosclerotic heart disease as the "immediate cause" of death, but an autopsy revealed "extensive and massive bilateral acute pulmonary embolism, moderate hypertensive cardiovascular disease, up to 40% stenosis in various arteries, and mild emphysema" and concluded that "'the immediate cause of death was extensive and massive acute bilateral pulmonary thromboembuli.'" *Id*. at *5 (quoting the autopsy report).

The plaintiffs contended that the definition of "Business Travel Hazard" in the policy covered the insured's death by pulmonary embolism, which was caused by his air travel, and further asserted that it fell within the definition of unavoidable exposure to elements arising from a covered hazard. *Id*. The plaintiffs further argued that the prevailing federal common law of ERISA holds that "a death is accidental if 'the insured [subjectively] did not expect an injury similar in type or kind to that suffered,' but not if 'a reasonable person, with the background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct.'" *Id*. at *9 (quoting *Wickman.*, 908 F.2d at 1088-89). Applying this expectation test, the plaintiffs argued that the insured's "death was accidental because it can fairly be assumed that he did not subjectively believe that his international flight would kill him, and this expectation was reasonable." *Id*. at *10.

Because the *McAuley* court found the term "accident" to be "disarmingly difficult to define," it relied on the Supreme Court's Warsaw Convention analysis from *Olympic Airways*, and determined that the insured's death was not the result of an accident because there was "no unusual, unexpected event external to [the insured]." *Id*. at *18. The court also found that it

was reasonable for the insurance company to deny coverage based on the policy exclusions for disease, illness, or bodily malfunctions. *Id*. at *22. In the final analysis, the court concluded that even under the more demanding *de novo* standard of review, the insurance company's interpretation was "not only reasonable, but also correct." *Id*. at *24; *see also Williams*, 2013 WL 1431822, at **2, 12 (applying *de novo* standard and finding that death caused by pulmonary thromboembolism after prolonged air travel was not covered as an accident under policy language that defined bodily injury as "sustained as a direct result of an unintended, unanticipated accident that is external to the body"); *Appeldorn*, 2010 WL 3475915, at **4-5 (under *de novo* review, court relied on Warsaw Convention case law reasoning to hold that "developing the disease of meningitis on an ordinary and uneventful airplane flight does not qualify as an 'injury' or an 'accident'" under policy language providing coverage for "bodily injury resulting directly and independently of all other causes from accident").

These out-of-circuit cases further support the reasonableness of Standard's interpretation of its policy language. Under the arbitrary and capricious standard of review, our role is solely to decide whether Standard's definition was "downright unreasonable." *Davis*, 444 F.3d at 576; *see also Komperda v. Hartford Life and Accident Ins. Co.*, No. 02 C 5359, 2003 WL 21148023, at *7 (N.D. Ill. May 14, 2003) (even though plaintiff's definition of accident as "an event the result of which is unintended from the perspective of the participant" was reasonable and had even been adopted by some courts, defendant's decision to deny benefits was still not arbitrary and capricious). We find that Standard's construction of the term "accident" was "within the range of reasonable interpretations," *see Green*, 595 F.3d at 738, and therefore it was not downright unreasonable. Consequently, we find Standard's decision to deny benefits was not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment (doc. # 30) is granted. The plaintiff's motion for summary judgment (doc. # 27) is denied. Judgment is hereby entered on behalf of the defendant. This case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: May 19, 2014**